*E-FILED 03-09-2011*

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| AMERICAN METAL & IRON, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NOAH ENTERPRISES, INC. dba TMG METAL, INC.,<br><br>Defendant.<br>_____/<br>RELATED COUNTERCLAIMS<br>_____/ | No. C09-04848 HRL<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## INTRODUCTION

American Metal & Iron, Inc. (AMI) sues to recover the unpaid price for several container loads of scrap aluminum sold to TMG Metal (TMG). TMG admits not paying, but alleges in a counterclaim that, because AMI refused to continue to ship material, TMG had to buy—at a higher price—substitute material from another supplier. TMG's cost of the alleged "cover" material exceeds the amount it concededly owes for the earlier shipments by AMI. All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. 28 U.S.C. § 636(c); FED. R. CIV. P. 73.

As explained below, the court decides that AMI should have judgment for the full amount claimed, and TMG should take nothing on its counterclaim.[1]

FINDINGS OF FACT

1.     AMI is a California corporation with its principal place of business in San Jose. It is a commercial buyer and seller of scrap metals.

2.     Noah Enterprises, Inc., a New Jersey corporation with its principal place of business in New Jersey, is also a buyer and seller of scrap metals. It does business as TMG Metal. Primarily, TMG acts as a middle man, buying scrap from many sources and selling it to its end-user customers in Korea. (Ex. 228). TMG arranges for scrap it purchases to be delivered from its source directly to TMG's buyers overseas.

3.     From about 2005 until mid 2009 TMG regularly bought scrap metal from AMI.

4.     The purchase and sale transactions between AMI and TMG were documented by filled out Purchase Order forms from TMG and filled out Purchase Contract forms by AMI.

5.     The TMG form specified that payment was to be by: "T/T against faxed shipping documents." "T/T" stands for "telegraph transfer" (i.e.: wire transfer), and "against faxed shipping documents" refers to the delivery of container loads of scrap to the Port of Oakland. (Ex. 205, 206).

6.     AMI's form said COD: Cash on Delivery. In practical terms, that is the same as T/T against faxed shipping documents.

7.     "Delivery" took place at the Port of Oakland when AMI turned over a container of scrap material to the freight forwarding company acting as TMG's agent and shipping documents were created and exchanged. At that point, AMI would issue an invoice ("against shipping documents") and send it by facsimile to TMG. It was due and payable immediately. TMG always paid by wire transfers to AMI's bank.

8.     On the back side of the AMI form are boilerplate Terms and Conditions of Sale. One such term gives AMI the right to delay shipment or cancel if the buyer is in arrears.

---

[1] The court has not reviewed a transcript of the trial testimony. Its decision is based on its recollection, aided by its notes, of the testimony, plus its examination of the exhibits admitted into evidence.

2

1 Another specifies a 1.5% per month charge on past due balances. Incidental, consequential, and
2 special damages are waived.

3     9. AMI never signed any of the TMG Purchase Orders on the "Accepted by" line.
4 Sometimes TMG did sign the AMI Purchase Contract, and sometimes not. The two that are at
5 the heart of the dispute here were not signed by TMG. (Ex. 14, 15).

6     10. The business dealings between the parties were conducted by Howard Misle,
7 president of AMI, and Spike Lee, president of TMG. Although sales documents were
8 sometimes sent back and forth by facsimile or as attachments to e-mail, Misle and Lee often did
9 business in person in Misle's office. (Lee traveled to California frequently to call on his
10 suppliers).

11     11. Misle testified that Lee was well aware of the language on the back side of the
12 AMI contract, and that he had seen him read it one time in Misle's place of business when they
13 entered into one of their transactions. Lee, who did not testify at trial, took refuge in a faulty
14 memory when questioned at his deposition. The parties dispute whether the back side terms are
15 binding on TMG.

16     12. Other than the requirement for payment upon delivery, neither party paid any
17 real attention to the terms and conditions in the other's forms until, ultimately, their relationship
18 was sundered over TMG's refusal to pay an overdue balance, coupled with AMI's refusal to
19 ship more material until the balance was paid.

20     13. There is no dispute that the sales of scrap metal from AMI to TMG were
21 supposed to be cash transactions. Payment was due at the time the material was placed in the
22 hands of TMG's freight forwarding company at the Port of Oakland. Likewise, there is no
23 dispute that during some earlier period of time, it did not always work that way in practice. In
24 August 2008 TMG had run up a balance due of over $1.2 million, and AMI decided it could no
25 longer act as TMG's de facto banker.

26     14. In around August 2008, Misle talked to Lee about the balance. He said he would
27 not ship further until the balance was paid. Lee said he could not pay unless AMI continued to
28 ship. Lee proposed that, if AMI would ship, he would immediately pay not only the current

*United States District Court*
For the Northern District of California

3

1  invoice but also the oldest outstanding one. Fearing he otherwise might never see the money
2  owed, Misle reluctantly agreed.

3      15.    The modified payment plan worked well for several months. T he outstanding
4  balance was substantially reduced as time went by.  (Ex. 21).

5      16.    On December 3, 2008 TMG issued to AMI two purchase orders, No. 18655 and
6  18657 (Ex. 204, 205).  AMI combined both into Purchase Contract No. 1009 (Ex.14).  At the
7  prices specified, AMI was to supply four different grades of aluminum scrap:   450,000 pounds
8  (ten containers) of "6063," 900,000 pounds (20 containers) of "Telic," 90,000 pounds (2
9  containers) of "Old Sheet," and 45,000 pounds (1 container) of "Auto rims."

10     17.    AMI began shipping some of the containers called for in No.1009 on January 22,
11 2009.

12     18.    On February 20, 2009 TMG issued purchase orders No. 18809,18810, and
13 18811.  (Ex. 206).  AMI prepared Purchase Contract No. 1045 on the same day.  (Ex. 15).
14 TMG was ordering more aluminum scrap:   45,000 pounds of "Tense," 90,000 pounds of
15 "Taint/Tabor," and 450,000 pounds of "6063."

16     19.    AMI shipped the first two containers of "6063" under contract 1045 on March 3,
17 2009, and additional containers in the following weeks.  (Ex. 22).

18     20.    By February 2009 TMG had fallen behind in its commitment to immediately pay
19 the current invoice plus the oldest one.  The outstanding balance started to trend upward.
20 Material shipped and invoiced in late February was not paid for until late March.  Material
21 shipped in early March was not paid for until over 30 days later in April.  AMI invoice # 4275,
22 due for payment on March 16, was not paid until May 19.  True, the outstanding balance was
23 trending back down again, but by then there would have been no balance at all had TMG
24 adhered to its payment obligations.

25     21.    Misle felt that AMI was being strung along.  In part, his hardened attitude toward
26 TMG was caused by an incident back in about December 2008.  Lee told him that TMG was not
27 going to pay for a shipment (worth about $100,000) now in the end-user's hands because the
28 material was steel and not aluminum.  That assertion was utter nonsense, thought Misle,

4

1 because the container in question was full when it arrived at the Port of Oakland (photos were
2 taken of the container contents just before the doors were sealed), and it weighed in about
3 45,000 pounds. That meant the contents were aluminum. If the container had been loaded with
4 steel, it would have weighed three times more. In any event, Misle spent $5,000 on a plane
5 ticket to send one of his employees over to Korea to look at the shipment for himself to confirm
6 what Lee surely already knew: it was aluminum. TMG ultimately paid for the shipment, but
7 the incident left Misle thinking Lee had been trying to cheat him.

8   22. By June 3, 2009, the outstanding balance was over $146,000 and no payment had
9 been received since May 19, 2009. AMI made a shipment on the outstanding TMG contracts
10 on May 27, 2009 and June 3, 2009, but that was it.

11   23. Misle told Lee he would ship no more unless the balance was paid in full. Lee
12 acknowledged several such conversations with Misle in early June. Lee's response, according
13 to his deposition testimony, was that AMI "[should] honor the contract and effect the shipment,
14 and I will do my best to expedite payments." (Deposition of Spike Lee at 68:13-14). (TMG did
15 make a payment on June 26, 2009 which brought the balance down to $103,234.18). Misle
16 refused to back down. He wanted payment in full. No further payments were made.

17   24. Apparently unwilling or unable to accept Misle's decision, TMG began to
18 pepper Misle with requests, then demands, for him to ship at least some of the balance of the
19 material on contracts 1009 and 1045. (Ex. 220, 221, 222, 223). Misle stood firm.

20   25. On contract 1009 AMI had not yet shipped 10 of the 20 containers of "Telic" and
21 the one container of "Auto rims." On 1045, there were still outstanding 3 containers of the
22 "6063" material.

23   26. After crediting the June 26th payments, there were 6 unpaid (and overdue)
24 invoices: #42726 and 42734 (due March 20), #42974 (due March 21), #43289 (due April 15),
25 and #44303 (due June 3). Total owing: $103,234.18. (Ex. 22).

26   27. In a letter dated July 9, 2009 (Ex.224) TMG's lawyer represented that he would
27 hold the $103,234.18 balance due in his escrow account and pay it over as soon as AMI shipped
28

5

1    the material under the contracts that TMG needed. No mention was made of when payment

2    would be forthcoming for the material that TMG wanted shipped then.

3         28.    Misle testified that he wanted the overdue balance paid in full and that he would

4    not ship more material until he had that money. He was not interested in a representation from

5    some lawyer he did not know to hold money which by rights he should have already been paid

6    in order to get him to ship additional material without any assurance he would be paid for it.[2]

7         29.    On July 10, 2009 AMI's lawyer wrote back to TMG's. In effect, she said TMG

8    should pay the money that everyone agreed was due and owing, and then they could talk about

9    further shipments.

10        30.    TMG's General Manager, Peter Sung, testified that he suspected the "real"

11   reason that AMI would not ship the balance of the material under contracts 1009 and 1045 was

12   that it had another buyer willing to pay a higher price. No evidence was introduced to support

13   this speculation, and the court rejects it out of hand.

14        31.    The balance, $103,234.18, was not paid. No one contends that it was not due

15   and owing. The material was conforming. TMG was paid by its customers for it. TMG's

16   "defense" to payment solely rests on the strength of its counterclaim. It argues that it spent

17   $140,000 in cost of "cover" on account of AMI's failure to fulfill the balance of contacts 1009

18   and 1045, and that the money due to AMI should be offset against its cover cost, for a net

19   recovery to TMG of about $37,000.

20        32.    TMG introduced copies of contracts (Ex. 215 through 219) prepared in August

21   and September 2009 between it and two other companies that sold scrap aluminum: Alco Iron

22   & Metal (Alco), a California company (4 contracts), and Syarika Balamurugan, a Malasysian

23   company (1 contract). In these contacts, TMG appears to be buying the material that AMI had

24   refused to ship under its contracts 1009 and 1045 (as well as other material). Prices are higher

---

[2] Why did not TMG propose to first pay in full the balance due and then to escrow with a neutral party the money to pay for what it wanted AMI to ship? Misle might have gone for that. Such a proposition was, of course, not feasible unless TMG had the money to pay both the balance and for the new shipment. Apparently, it did not.

6

than those in 1009 and 1045. However, no proof was offered that TMG actually paid the prices indicated, or that it paid at all.

33. Curiously, each Alco contract states that TMG made $50,000 pre-payments, with the balance to be paid on delivery. Curious, because TMG's General Manager testified that TMG did not make those pre-payments.

34. Additionally, each Alco contract that was introduced at trial bears the "acceptance" signature of Spike Lee on behalf of TMG, signatures dated in August and September 2009. This too is curious, since copies of these same contracts produced by TMG to AMI during discovery in 2010 did not bear Lee's signature.

35. More troubling yet, TMG failed to satisfactorily prove that the materials purportedly purchased from Alco and the Malaysian company actually went to the customers who otherwise would have gotten the balance of the material under AMI's contracts 1009 and 1045.

36. Worst of all, TMG did not establish that it had fixed price contracts with the customers who would have gotten the balance of the material if AMI had shipped it. If the Alco and Malaysian material actually made up for the unshipped balances on 1009 and 1045, but TMG was able to pass on to the customer the increased price of the replacement material, then TMG suffered no damage because of AMI's refusal to ship (even assuming AMI was in breach for its refusal). This evidentiary gap alone is fatal to TMG's counterclaim.

CONCLUSIONS OF LAW

1. This court has jurisdiction on the basis of diversity of citizenship. 28 U.S.C. § 1332. The action, originally filed in state court, was properly removed here by defendant TMG.

2. The parties agree and this court concludes that the California Commercial Code applies to the scrap metals transactions at issue here.

3. TMG breached its written contractual obligation to pay AMI for containers of scrap aluminum upon delivery of the containers to the Port of Oakland.

4. Although it performed for a while, TMG also breached its oral agreement with AMI to bring its outstanding balance down to zero by paying immediately upon delivery for each new shipment plus the oldest outstanding invoice.

5. Since TMG was in default of its payment obligations, AMI was entitled to withhold its further performance under contracts 1009 and 1045, California Commercial Code Section 2703(a).

6. In view of TMG's long history of failing to pay for purchases as agreed, and even if TMG had paid off the whole outstanding balance in June 2009, AMI would have been entitled to withhold further deliveries until it had adequate assurance of TMG's ability to pay as agreed. AMI, in effect, sought that assurance, but it was never given. Cal. Com. Code § 2609.

7. Since it is indisputable that TMG could not pay AMI's invoices when they were due (in effect, it was insolvent), AMI had the right under California Commercial Code section 2702 to demand immediate payment for material previously delivered and to stop any further delivery. Cal. Com. Code § 2702.

8. AMI is entitled to recover the price for the material it sold and delivered to TMG and for which it has not been paid: $103,234.18. Cal. Com. Code § 2709.

9. AMI shall also recover prejudgment interest at the applicable legal rate.[3]

10. With one exception, none of the back side terms on AMI's form contact is relevant to this court's decision. Thus, the court does not have to find whether or not they are binding upon TMG. The exception is the 1.5% per month "late charge" on outstanding balances. Even assuming that TMG was bound by that term, AMI waived it by never during their relationship, and despite an outstanding balance that once exceeded $1,000,000, ever seeking to enforce it. The court declines to apply the contractual 1.5% per month as the rate for prejudgment interest.

---

[3] If the parties cannot agree on the amount, plaintiff may move the court to make the determination.

11.     TMG shall take nothing on its counterclaim.[4]

Dated:   March 9, 2011

_____
HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

---

[4] The court has tried to avoid commingling findings of fact with conclusions of law. However, if any conclusion has inadvertently been labeled as a finding (or vice versa), it should be considered in its true light regardless of the label on it.

9

1 5:09-cv-04848-HRL Notice has been electronically mailed to:

2 Elizabeth Marie Pappy     epappy@mffmlaw.com, cmacias@mffmlaw.com

3 Mark B. Fredkin     mfredkin@mffmlaw.com, crogers@mffmlaw.com, dolson@mffmlaw.com, dwaslif@mffmlaw.com, gdent@mffmlaw.com, jlira@mffmlaw.com, mramos@mffmlaw.com, wsiamas@mffmlaw.com

5 Sukjin Henry Cho     sjhenrycho@pakcho.com, ahn@pakcho.com

6 Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program.